IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  13-cv-02884-LTB

KYRIA K. VAN SICKLE,

           Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

           Defendant.

_____

ORDER

_____

       Plaintiff, Kyria K. VanSickle,  appeals from the Social Security Administration ("SSA")

Commissioner's final decision denying her application for disability insurance benefits, filed

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for

supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381-1383c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral argument would not

materially assist me in the determination of this appeal.  After consideration of the parties'

briefs, as well as the administrative record, I AFFIRM the Commissioner's final order.

## I.  STATEMENT OF THE CASE

       Plaintiff seeks judicial review of the Commissioner's decision denying her applications

for disability insurance benefits and for supplemental security income filed in August and

September of 2010. [Administrative Record ("AR") 238-48]  After the applications were initially

denied on January 26, 2011, an Administrative Law Judge ("ALJ") conducted evidentiary

hearings on April 24, 2012 and July 10, 2012, and issued a written ruling on July 13, 2012. [AR

11-23, 30-102]  The ALJ denied Plaintiff's applications on the basis that she was not disabled

because considering her age, education, work experience and residual functional capacity

("RFC"), jobs exist in significant numbers in the national economy that Plaintiff could to

perform (Step Five). [AR 22] The SSA Appeals Council subsequently denied Plaintiff's

administrative request for review of this ruling, making the SSA Commissioner's denial final for

the purpose of judicial review. [AR 1-3] *See* 20 C.F.R. §416.1481. Plaintiff timely filed her

complaint with this court seeking review of the Commissioner's decision.

## II. FACTS

Plaintiff was born on September 18, 1978, and was 33 years old on the date of the ALJ's

ruling. [AR 21, 78] She had obtained a high school education via GED. [AR 21, 62] Her past

relevant work history was as a cashier/checker, receptionist, administrative assistant,

accounting/payment clerk, and store laborer. [AR 21] Plaintiff alleged that on July 13, 2010, she

became disabled due to her bipolar disorder, borderline personality, diabetes, fibromyalgia,

attention-deficit disorder (ADD), anxiety, and depression. [AR 276]

The medical records regarding Plaintiff's physical conditions commence in December of

2009, when Plaintiff was seen at Rocky Mountain Family Medical with left shoulder pain and an

inability to lift her arm up over head lasting a week. [AR 366-67] Examination at that time

revealed weakness in her grip strength and decreased range of motion in her shoulder. [AR 367]

On January, 21, 2010, Plaintiff returned to Rocky Mountain Family Medical complaining of

back and neck pain. [AR 362-63] She rated her pain as an 8 out of 10, and indicated that it was

made worse by sitting. [AR 362] The next month, on February 16, 2010, she returned

complaining of knee pain which she rated as a 9 on a scale of 1 to 10. [AR 360-61] On April 10,

2010, Plaintiff was seen for a fever and chills. [AR 358-59]

The record contains notes from her treating physician, Robert Rees-Jones, M.D., which indicate that from April 28, 2010 though September 1, 2010, Plaintiff was using an insulin pump to control her diabetes with no reported problems. [AR 469-81]

On May 5, 2010, Plaintiff saw Jon Scott, M.D., at Colorado Neurology Specialists. [AR 529-32]  At that time Plaintiff complained of a long history of pain "over [her] entire body" which worsened in August 2008 after surgery on her foot for chronic foot pain. [AR 529]  She also reported headaches, depression, anxiety, fatigue, weakness, falls, shaking, dis-coordination, muscle cramps, tingling, back pain and constipation.  Plaintiff reported seeing a pain specialist, and that she had two to three falls over the last few months. [AR 529]  Upon examination, Dr. Scott noted that she had full strength (5/5) in all muscle groups, intact sensation, normal coordination, and a normal gait.  Dr. Scott indicated a differential diagnosis of either multiple sclerosis or fibromyalgia. [AR 530]

Plaintiff saw Dr. Scott again on June 8, 2010 and complained of diffuse pain, tremors, and headaches. [AR 527-28]  At that time Dr. Scott ruled out multiple sclerosis, based on MRI results, and found her symptoms "most consistent" with fibromyalgia. [AR 527]  In addition, he indicated that the tremors were a side effect of Plaintiff's current medications. Examination revealed full strength (5/5) in all muscle groups, intact sensation, normal coordination, and a normal gait. [AR 527]

On December 30, 2010, Plaintiff underwent a consultative examination with Dr. Elizabeth K. Steiner. [AR 464-68]  At that examination Plaintiff reported using her insulin pump to control her blood sugar with varying degrees of success and, although she reported lapsing into a diabetic coma in 1997, she did not report any current symptoms related to her diabetes.

[AR 465-66] Dr. Steiner indicated no evidence of end organ damage. [AR 466] Plaintiff reported

that she could walk one mile and performed all her activities of daily living without difficulty

(including driving).  However, she  could only sit for 30 to 40 minutes and could stand for about

the same period of time. [AR 465]  She did not feel that she had any problems with dexterity,

hearing, speech, pushing, pulling, balance, climbing, reaching, and occasional bending and

squatting. [AR 465]  On examination, Dr. Steiner noted that the range of motion in her cervical

spine, hips, ankles, shoulders, and wrists was all normal; she had a normal gait; her sensation

was intact; and she had full (5/5) motor strength. [AR 465-66]  As a result, Dr. Steiner opined

that Plaintiff:

> could lift and carry, by this exam, an estimated 40 pounds easily. One hundred to
> two hundred pounds on a rolling cart could be pushed or pulled. She ha[d] no
> problems with reaching from waist to overhead level. I would not put her up on
> heights because she might have a bit of unsteadiness in her balance. She [could]
> bend and squat occasionally, drives. She could sit for 40 minutes at a time, link
> these time periods together for 6 hours out of a typical 8-hour day, stand for 40
> minutes at a time and link these periods together to make up the difference. She
> [felt] she [could] walk a mile. [AR  467]

On January 25, 2011 – as part of the initial determination of her applications – Frances

Talmadge reviewed Plaintiff's medical records and filled out a Physical Residual Functional

Capacity Form in which she indicated that Plaintiff could frequently lift 10 pounds, but only

occasionally lift 25 pounds; she could stand and/or walk and sit for about 6 hours in an 8-hour

workday. [AR 110-112]  Plaintiff could occasionally climb ramp/stairs, balance, stoop, kneel and

couch, but she should never climb ladders, ropes or scaffolds due to her fatigue and unsteadiness.

[AR 111]  She should likewise avoid machinery due to daytime sleepiness and unsteadiness. [AR

112]

4

Plaintiff later returned to see Dr. Scott on September 27, 2011, when she was five months pregnant. [AR 525-26]  At this visit Dr. Scott noted Plaintiff's past diffuse pain, headaches and tremors. [AR 525]  She "had an extensive workup, which was unremarkable," but he ultimately opined that she had fibromyalgia-like symptoms. [AR 525]  At that visit, Plaintiff's physical status was generally normal – with full (5/5) strength, intact sensation, and normal coordination and gait – but included slightly decreased vibratory sensation and reflexes. [AR 525]  Dr. Scott noted that her treatment options for fibromyalgia and pain were limited due to her pregnancy. [AR 526]  At a follow-up visit on November 11, 2011, Plaintiff continued her treatment with minimal use of pain medications. [AR 523-24]

On July 22, 2012, Plaintiff was seen by Jay H. Dworkin, a podiatric surgeon. [AR 519-20]  Dr. Dworkin diagnosed bilateral foot pains and recurrent ingrown toenails.  He performed surgery to address her foot deformity and her plantar facades. [AR 518-21]

The medical records regarding Plaintiff's mental heath impairments commence on  July 29, 2009, when Plaintiff began treatment at Aurora Mental Health. [AR 454-57]  At her initial visit with Cynthia Wang, Ph.D., Plaintiff complained of being unable to afford her mental health medications and was "feeling more depressed."  Dr. Wang noted her history of "mood liability and borderline traits" and that she clearly presented with mood liability and poor coping skills. [AR 457]  Dr. Wang  indicated diagnosis of Bipolar Disorder II, "R/O Depressive Disorder, Recurrent, Moderate," Borderline Personality Disorder, Insulin Dependent Diabetes, Hypothyroidism and Obesity, and she assigned Plaintiff a Global Assessment of Functioning (GAF) score of 60. [AR 456]  Dr. Wang provided her with medication and ordered therapy. [AR 457]  On August 17, 2009, Plaintiff began therapy sessions with social worker Kendra Liedtke,

L.C.S.W., at Aurora Mental Health.  At that time she was "doing pretty well overall." [AR 450-51].

At her next visit to Dr. Wang, on October 27, 2009, Plaintiff indicated that she had been feeling angry and more paranoid, but she denied any suicidal ideation. [AR 447-49] Her mental status examination revealed and "up and down" mood; appropriate affect; normal speech; logically directed thought processes; no delusions or hallucinations; normal cognition; intact judgment and insight; no suicidal ideation; and normal reasoning. [AR 449]  Dr. Wang assessed that she was relatively stable and again assigned Plaintiff a GAF score of 60. [AR 449]

On November 23, 2009, Plaintiff presented to Ms. Liedtke for therapy with a depressed, overwhelmed mood. [AR 444-46] During her appointments with Ms. Liedtke on December 14, 2009 and January 11, 2010, Plaintiff reported that she was miserable and had high anxiety related to her relationship with her boyfriend. [AR 437-40]  The record reveals numerous cancelled appointments with Aurora Mental Health during this time. [AR 443, 444, 449]  For example, Plaintiff cancelled the rest of her January and all of her February 2010 counseling sessions. [AR 434-36]

During her March 16, 2010 appointment, Ms. Liedtke felt that Plaintiff's stressful relationship with her boyfriend and financial stress was exacerbating her symptoms. [AR 432-34] Plaintiff expressed an "urge for suicide" but with no plan. [AR 434.  Then, on March 25, 2010, Plaintiff contacted the crisis line at Aurora Mental Health because she felt suicidal. [AR 429-30]  She subsequently admitted herself to Centennial Peaks Hospital due to escalating depression and suicidal ideation. [AR 422-426]  After her discharge, Plaintiff saw Ms. Liedtke on April 5, 2010, when she admitted to chronic suicidal ideation, but denied having a plan. [AR

422]  Plaintiff did not feel that the hospital stay had helped, but Ms. Liedtke believed that, overall, she seemed "a bit more stable." [AR 422]  In addition, Plaintiff reported that a new medication was helping her mood remain slightly more stable rather than having extreme ups and downs. [AR 422]

On April 8, 2010, Plaintiff told Dr. Wang that she was feeling much better. [AR 419-22] Dr. Wang noted that Plaintiff had not been taking her medications for six months prior to the hospitalization, and that it appeared that her new medication was helping. [AR 421-22]  She felt that Plaintiff's mood was "up and down;" her affect was subdued; speech was normal; thought process was logically directed; she had no delusions or hallucinations; judgment and insight were intact; she had normal reasoning; and Dr. Wang assigned her a GAF score of 60. [AR 421] At her April 26, 2010 appointment with Ms. Liedtke, Plaintiff appeared more hopeful and overall had a brighter affect and her mood was more stable. [AR 416-17]  On May 24 2010, she reported to therapy feeling overwhelmed, but denying suicidal ideation, hopelessness, or despair. [AR. 414-16

On June 10, 2010, Plaintiff presented to Dr. Wang with a pleasant mood and affect. [AR 411-12] Plaintiff indicated that she had not been compliant in taking her medications and she reported feeling overwhelmed, but was avoiding suicide ideation and self-harm. [AR 412]  Her GAF assessment was a score of 60. [AR 412]  During her therapy session on June 15, 2010, Plaintiff presented more animated and with a pleasant effect, although she had increased anxiety due to being recently charged with driving under the influence. [AR 409-10]  However, overall her mood was better – she appeared more stable and clam – and she had no suicidal ideation. [AR 409-10]  She reported her recent fibromyalgia diagnosis and reported being in constant

7

pain. [AR 409]

At her next appointment on July 12, 2010, Ms. Liedtke reported that Plaintiff exhibited limited eye contact and appeared highly distressed. [AR 406-8]  She was tearful, hopeless, and was hearing voices. [AR 406]  Then, on July 13, 2010, Plaintiff admitted herself to Centennial Peaks Hospital because she was hearing voices. [AR 406]  She was subsequently discharged, on July 21, 2010, after approximately seven days. [AR 398] The doctor on staff, Dr. Keeling, reported that she came in with "vague complaints of auditory hallucination" but had been re-stabilized on her medications. [AR 398]

Upon her release, Plaintiff saw Jeffrey Longo, Ph.D., at Aurora Mental Health on July 26, 2010 during Dr. Wang's maternity leave. [AR 397-98, 402]  Plaintiff told Dr. Longo that the voices came on suddenly, she had not heard them in years, and she was now able to ignore them. [AR 397]  She also reported that she had been fired from her administrative assistant job due to missing work while she was in the hospital. [AR 397]  She was thinking of applying for disability and going back to school to become a medical assistant. [AR 397]  On August 4, 2010, she told Dr. Longo that she wanted to work part-time because she did not feel she could work full-time and on August 17, 2010, she reported to him that she was still hearing voices in the background, but he assessed that she was "coping well." [AR 392-93] On August 19, 2010, she reported to Dr. Wang that she was doing "pretty good" and she was better since her hospitalization. [AR 390-91] She felt that her current medications were working well, but was concerned she could no longer afford her medications because she now had no insurance. [AR 390]

On September 2, 2010, Plaintiff told Dr. Longo that she was still hearing voices when she was alone and had suicidal thoughts and urges to cut herself. [AR 388-89]  She was making and delivering burritos with her brother-in-law, which she enjoyed and for which she was earning money, and she wanted to go back to school. [AR 388]  At this time she began a few group therapy sessions with Aurora Mental Health. [AR 377-85]  In so doing, she reported her problems were suicidal ideation, avoidance, yelling, and anger outbursts, but she had been able to decrease the frequency of some of these issues. [AR 384]

On December 3, 2010 – during her appointment with consultative physician Elizabeth Steiner – Plaintiff reported with a flat affect but "answer[ed] questions and interact[ed] well." [AR 464-68]  Dr. Steiner noted that Plaintiff was able to do multi-step requests and "no longer hears voices" on her current medication. [AR 466]  Dr. Steiner opined that Plaintiff could socialize, complete tasks, and that she had average intelligence to perform tasks. [AR 467]

On January 25, 2011 – as part of the initial determination of her applications –  Ellen Ryan, M.D., reviewed Plaintiff's medical records and filled out a Mental Residual Function Form in which she opined that  Plaintiff could "do work of limited complexity requiring accuracy and attention to detail" and that she could work with supervisors if the contact was not frequent or prolonged, and should have less interaction with coworkers or the public. [AR 109-14]  Dr. Ryan pointed to Plaintiff's "slightly reduced recall and concentration" at her consultative examination with Dr. Steiner, as well as her ability to do multi-step instructions as support for her findings. Thus, she found "sustained concentration and persistent limitations." [AR 114]

After a year-long lull in therapy sessions, Plaintiff returned to Aurora Mental Health. [AR 482-84]  During a telephone call on August 11, 2011 with Ms. Liedtke, she reported that

she was three months pregnant and doing "surprisingly well" off her medication. [AR 485-86] Plaintiff then saw Ms. Liedtke on September 19, 2011. [AR 489-92]  Ms. Liedtke reported that Plaintiff was stable with a bright affect and appeared better able to cope with stressors and she was calmer in general. [AR 489-91] Plaintiff denied depression, mania, or psychosis; she stopped all medications and had no desire to return to them; and she claimed that "all is going well" since the end of August. [AR 490-91]

The next month, on October 17, 2011, Plaintiff indicated to Ms. Liedtke that she was doing well, with a fleeting thought of suicide ideation, but she appeared calmer and more hopeful that in the past. [AR 492-94]  She was on unemployment and hoping to pursue a work-from-home job taking phone orders. [AR 492] On December 15, 2011, she again reported that things were "going fairly well for the most part." [AR 495-97] At this visit, Plaintiff was 30 weeks pregnant, had been seeking work but could not find anything, and felt mentally prepared for baby to arrive. [AR 4976]

Plaintiff gave birth to her baby in January of 2012. [AR 497-98] Then, on March 8, 2012, Plaintiff called Aurora Mental Health requesting an immediate therapy appointment due to an increase in depressive symptoms, and she also wanted to see Dr. Wang in order to discuss medication. [AR 499]  During a telephone call with Ms. Liedtke on March 19, 2012, Plaintiff reported that she was doing fairly well with some ups and downs after the birth of her baby until recently when the Department of Human Services removed her baby from her custody. [AR 347, 500-05]  On March 26, 2012, Plaintiff saw Ms. Liedtke who noted that Plaintiff was suffering from situational depression due to financial stress, unemployment, risk of eviction, and the removal of her son. [AR 506-08]  Plaintiff was distressed, upset, frustrated and tearful at this

10

appointment, and stated that she is "100 times worse" because of losing custody of her son. [AR 508]  During her April 19, 2012 appointment,  Plaintiff stated that she would not need mental health treatment if it were not for the removal of her son. [AR 510]  Plaintiff also saw Dr. Wang when she reported significant depression and anxiety. [AR 514-17]  Dr. Wang prescribed an antidepressant and anti-anxiety medication, and assigned her a GAF score of 55. [AR 514]

At Plaintiff's hearing on July 10, 2012, psychologist Jeffrey Andert, Ph.D. testified that after reviewing her medical records, it was his opinion that Plaintiff did not meet a presumptively disabling listing. [AR 50, 232]  Dr. Andert also testified that Plaintiff retained the cognitive ability to understand and carry out basic, simple instructions; however, due to the nature of her impairments and the variability in her behavior, he determined that she could not perform complex and detailed tasks, and that she should be precluded from interaction with the general public. [AR 53-55]  In addition, he opined that she would have moderate difficulty interacting with coworkers and supervisors and moderate limitations in responding to usual work situations and changes in the routine work setting. [AR 53-55]

## III. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct.  2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

In his ruling, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process. [AR 11-23]  In so doing, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 13, 2010 (Step One). [AR 13] The ALJ further determined that Plaintiff had the severe impairments of a bipolar mood disorder,

a borderline personality disorder, diabetes mellitus and fibromyalgia (Step Two), but that these impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 13-16]

The ALJ then determined that Plaintiff had the RFC perform light work, except that she can lift and carry 10 pounds frequently, but 20 pounds only occasionally, sit for 6 hours in an 8-hour workday, and stand and/or walk for 6 hours in an 8-hour workday. [AR 16]  In addition, she requires regular breaks, can never climb ladders/scaffolds, work around open machinery, or work at heights, or drive as part of her job.   The ALJ also determined that she could only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, frequently balance, and must avoid concentrate exposure to extreme cold or heat.  Finally, the ALJ determined that Plaintiff can perform occupations that can be learned in 30-60 days and can tolerate occasional work interaction with coworkers and supervisors, but no work interaction with the public. [AR 16-17] Based on this assessed RFC, and testimony from the vocational expert, the ALJ found that Plaintiff was unable of performing her past relevant work (Step Four). [AR 21]

The ALJ further found, however, that considering Plaintiff's age, education, work experience, and assessed RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [AR 21-22]  Because Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under disability as defined by the SSA. [AR 22]

### V. STANDARD OF REVIEW

This court's review is limited to whether the final decision is supported by substantial

evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).   Thus, the function of my review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).   "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, *supra*, 822 F.2d at 1521 (*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)).   I may not re-weigh the evidence or substitute my judgment for that of the ALJ.   *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).   With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.   *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI.  ISSUES ON APPEAL

As an initial matter, I note that Plaintiff's claims of error on appeal are difficult to ascertain. The Commissioner has attempted to respond to the claims by interpreting her arguments as a challenge to the sufficiency of the evidence.  However, because her opening brief sets forth three specific claims of error, I address each one in turn and, in so doing, attempt to address any argument that the ALJ's decisions were not supported by sufficient evidence.

14

## A. RFC Assessment

In her first claim of error, Plaintiff asserts that the ALJ erred "in determining that [Plaintiff] had the Residual Functional Capacity [RFC] to perform Work at Step 5 under SSR 96-8." The RFC represents the most that the claimant can still do despite her limitations, and must include all of the medically determinable impairments. In assessing RFC, the Commissioner considers a claimant's ability to meet the demands of work despite her impairments. 20 C.F.R. §§ 404.1545–1546, 416.945–946. The RFC assessment considers physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching; and mental abilities such as understanding, remembering, and carrying out instructions; and responding appropriately to supervision, co-workers, and work pressures. *20 C.F.R.* §§ 404.1545(b&c), 416.945(b&c). Social Security Rule ("SSR") 96-8 requires that the ALJ provide a function-by-function analysis when assessing a claimant's RFC.

In addressing Plaintiff's argument that the ALJ failed to properly assess her RFC – by finding she is able to perform light work with several other limitations – I first reject her assertion that the ALJ "relied on all of the testimony of the vocation expert" but failed to adopt his opinion that if Plaintiff needed a daily 1 to 1½ hour nap, such requirement would eliminate all available jobs. [AR 64-65] While it is true that the vocational expert testified – in response to the ALJ's question – that if Plaintiff needed to take a nap during the work day, such a requirement would not be acceptable in any kind of competitive employment, the ALJ did not find that Plaintiff needed a nap. As such, the vocational expert's testimony only related to a hypothetical situation that was not found to be present in this case. *See Barnett v. Apfel,* 231 F.3d 687, 690 (10th Cir. 2000)(ruling that vocational expert testimony in response to a

hypothetical which reflects a claimant's limitations may act as substantial evidence for finding the claimant is not disabled).

Plaintiff also appears to be arguing that the ALJ erred when assessing her RFC because he did not take into consideration "all the relevant evidence in the case" in that he failed to consider that Plaintiff was on prescription pain medications that caused her to be drowsy which, in turn, precluded her from working an 8-hour work day (and 40 hour work week) on a regular basis.   The medical records lacks any evidence of such drowsiness except Plaintiff's testimony during her second evidentiary hearing on July 10, 2012. [AR 30-68]  Specifically, in response to the ALJ's questions, Plaintiff indicated she was now taking two pain medications for the previous three weeks following her surgery (oxycodone and Dilaudid) that work together to bring her fibromyalgia pain down from a 7/10 (as reported in April 2012) to 5/10. [AR 39-41] When asked "do the oxycodone and/or Dilaudid have any side effects on you?"  Plaintiff responded only that "[t]hey make me itchy." [AR 41]  With regard to the Lorazepam, Plaintiff indicated that it makes her extremely drowsy, but that she takes it at night. [AR 42, 60]  Finally, with regard to Cymbalta, which was very recently prescribed to help with her fibromyalgia pain, Plaintiff testified that she was not yet aware if it had any side effects. [AR 41, 59-60]

Plaintiff's attorney then asked her if her pain medications caused any other side effect besides itchiness. [AR 57] After initially answering that it was primarily itchiness and, perhaps, difficulty in concentration, her attorney asked if they make her sleepy. [AR 57-58]  Plaintiff responded "sometimes" and when that happens, she takes a nap. [AR 58]  When asked how often she takes a nap after taking these pain medications, Plaintiff responded "Almost everyday." [AR 58]  Then, when asked "Would you be able to go to work eight hours a day, five days a week

16

taking these medications?" she responded "Absolutely not." [AR 59]

The ALJ addresses this testimony as follows:

The claimant testified that the Dilaudid/Oxycodone mix made her so tired that she napped 1-1½ hours daily in the late morning or early afternoon. However, she made these statements only under questioning by her representative, after first stating that the only side effect of her medications was itchiness. Furthermore, she has been on Oxycodone only since her foot operation in April 2012 and has taken Dilaudid for only 3 weeks, so there is no basis for concluding either that she will continue to use them for 12 months or that the alleged side-effects will last for 12 months. Although the claimant states that [Lorazepam – misidentified by the ALJ as Cymbalta] also makes her extremely drowsy, she testified that she takes it at night. Thus, the medication would not cause her to nap during the workday. [AR 18]

In addition, the ALJ acknowledged that "if the claimant requires daily naps, as she testified at the hearing, she would be unable to work at any competitive job. However, the [ALJ] has concluded that this testimony is not supported by the record as a whole and therefore is not credible for the reasons explained in this decision." [AR 22]

As such, Plaintiff's assertion that, when assessing her RFC, the ALJ failed consider that Plaintiff's pain medications caused her to be drowsy which preventing her from working an 8-hour work day (and 40 hour work week) on a regular basis, is contradicted by the ALJ's findings in his order which specifically addressed and rejected this evidence. This finding is supported by sufficient evidence in the record.

It appears that Plaintiff also asserts that the ALJ erred in concluding that the vocational expert's testimony as to available jobs was consistent with the Dictionary of Occupational Titles (the "DOT"). The vocational expert testified that an individual with the same age, education, work experience and RFC as Plaintiff would be able to perform occupations such as small

products assembler (DOT 706.684-022) and electronic worker (DOT 726.687-010). [AR 22]

In order for the ALJ to rely on expert vocational evidence as substantial evidence to support a determination of non-disability, the ALJ must ask the expert how his or her testimony as to the requirements of identified jobs corresponds with the DOT and elicit a reasonable explanation for any discrepancy. *Haddock v. Apfel*, 196 F.3d 1084 (10th Cir. 1999). Here, the ALJ determined that the vocational experts' testimony was consistent with the information contained the DOT [AR 22], and Plaintiff has failed to identify any discrepancy between the requirements of the identified jobs and her assessed RFC. As such, there is no error.

Finally, to the extent that Plaintiff is asserting that the ALJ failed to provide a function-by-function analysis as is required by SSR 96-8, the RFC assessed by the ALJ contained specific functional extertional limitations – in that she can perform light work except she can lift and carry 10 pounds frequently, but 20 pounds only occasionally; sit, stand and/or walk  for 6 hours in an 8-hour workday; requires regular breaks; can never climb ladders/scaffolds, work around open machinery, or work at heights, or drive; she could only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, or frequently balance; and must avoid concentrate exposure to extreme cold or heat – and well as non-extertional limitations – in that Plaintiff can learn the occupation in 30-60 days; can only tolerate occasional work interaction with coworkers and supervisors; and no work interaction with the public. As such, the ALJ's opinion provided the analysis that is required under SSR 96–8. *See Estrada v. Astrue,* 2013WL1222419 (D. Colo. 2013) (unpublished).

## B. Weight of Opinion Evidence

In her next claim of error, Plaintiff argues that "[t]he ALJ erred in not addressing all

medical opinions in the record and not assigning weight to consultant Ellen Ryan, M.D., and all of the treating doctors" when assessing Plaintiff's mental limitations of her RFC.

As an initial matter, to the extent Plaintiff is claiming that the ALJ failed to address the opinions of her treating physicians – namely, Dr. Scott; Dr. Dworkin; Dr. Rees-Jones; Dr. Wang; Dr. Longo; and her therapist, Ms. Liedtke – the record is devoid of any opinion expressed by these health care providers.  *See* 20 C.F.R. §404.1527(a)(2)(defining medical opinions as "judgments about the nature and severity of [a claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical and mental restrictions)."

Plaintiff also argues that the ALJ did not discuss Dr. Ryan's January 25, 2011 Mental Residual Functional Capacity Assessment. [AR 124-26]  Dr. Ryan reviewed Plaintiff's mental health records during initial determination of "not disabled." [AR 105-285]  In so doing, Dr. Ryan found that Plaintiff was moderately limited in her ability to carry out detailed instructions and work in coordination with or in proximately to others without being distracted by them, on the basis that "concentration intact at CE, anxiety may interfere at time, may be distracted by others." [AR 125]  She also determined that Plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instruction and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, on the basis that she "can be irritable, difficulty getting along with others." [AR 125]  Finally, Dr. Ryan opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, based on her review which found "ADLs OK, may have difficulty with change, poor coping." [AR 125]

The ALJ's order failed to address or discuss Dr. Ryan's findings as to Plaintiff's mental impairments.  Rather, the ALJ generally found that her "mental impairments are generally well controlled even without prescription medications" and reviewed Plaintiff's statements to her health care providers which "demonstrate a high level of mental functioning and indicate that she remains capable of work activity within the residual functional capacity found in this decision." [AR 21, 19]  The RFC restrictions assessed by the ALJ related to Plaintiff's mental impairments were that Plaintiff was given 30-60 days to learn the occupation, with only occasional work interaction with coworkers and supervisors and no work interaction with the public. [AR 17]

First, to the extent that Dr. Ryan is a Single Decision Maker ("SDM") – in that she assigned an RFC assessment at the initial consideration and denial of Plaintiff's application – such opinion is "worthy of no weight in an ALJ's analysis."  *Thongleuth v. Astrue*, 2011WL1303374 (D. Kan. 2011)(unpublished)(indicating that Courts in this district with one exception, have uniformly recognized that an SDM is not a medical professional, and that such opinion is worthy of no weight as a medical opinion).  Furthermore, while in this case the SDM appears to be a doctor, her assessed limitations are nonetheless consistent with the moderate functional limitations assessed by the ALJ's RFC.  Her opinion that Plaintiff was moderately limited in her ability to carry out detailed instructions and to respond appropriately to changes in the work setting was incorporated within the RFC requirement that the occupation be learned within 30 to 60 days.  Likewise, the assessed RFC limitation of only occasional work interaction with coworkers and supervisors addressed Dr. Ryan's opinion that Plaintiff was moderately limited in her ability and work in coordination with others, accept instruction/criticism from supervisors, and to get along with coworkers or peers.  Finally, the RFC mandates no interaction

with the public consistent with Dr. Ryan's opinion that Plaintiff was moderately limited in her ability to interact appropriately with the general public.

As such, the ALJ did not err in addressing either the "opinions" of Plaintiff's treating physicians or in failing to specifically address the opinion of the SDM, Dr. Ryan, regarding Plaintiff's mental functioning limitations of her RFC.

## C. Credibility

In her final claim of error, Plaintiff asserts that "[t]he ALJ erred in finding that the Plaintiff is not credible and could perform light work under SSR 96-7." In his order, the ALJ found that although the medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." [AR 18] Plaintiff asserts that the ALJ's credibility determination fails to contain "specific reasons" as is required by SSR 96-7p.

"[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)(citations omitted). A credibility analysis "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'" *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004) (*quoting* SSR 96–7p); *see also Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987).

Plaintiff first takes issue with the ALJ's determination that her testimony related to her need to take daily naps was not credible because "[h]e did not state the specific reasons in the record that did not support her testimony regarding [the] effects of her pain medications on her ability to be alert and concentrate." However, as discussed above, the ALJ's order contains

21

significant specific reasons for the ALJ to reject Plaintiff's testimony that she is unable to work because her medications make her so drowsy that she is required to nap during the day. The ALJ first noted that Plaintiff first testified that only side effect of her pain medications was itchiness, and did not indicate that they caused drowsiness until she was specifically questioning by her representative.  In addition, she had only been taking the medications for a few weeks and "there is no basis for concluding either that she will continue to use them for 12 months or that the alleged side-effects will last for 12 months." [AR ]  To the extent that Lorazepam makes her extremely drowsy, the testimony is clear that she takes it at night. [AR 18] These specific reasons for discounting Plaintiff's credibility, as to the effects of her pain medications on her ability to work, are both sufficient and closely and affirmatively linked to substantial evidence.

Plaintiff further contends that the ALJ failed to perform a proper credibility analysis as related to her testimony about her subjective complaints related to her allegedly disabling pain. However, the ALJ's order again contains sufficient specific reasons, linked to substantial evidence, for discounting her credibility related to her limitations due to pain.

At her initial hearing on April 24, 2012, Plaintiff testified that her mental health and her pain prevented her from working. [AR 83] When the ALJ questioned her, Plaintiff indicated that she suffered from fibromyalgia causing chronic pain throughout her entire body with a day-to-day pain level of around a 7 out of 10, with some days being worse. [AR 89-90] She indicated she was on pain medications related to her very recent foot surgery. [AR 90-95] At her second hearing on July 10, 2012, Plaintiff testified that her pain medications had reduced her day-to-day pain level to a 5 out of 10. [AR 41]  In addition, Plaintiff testified that her foot pain had increased and that she could now only stand for 5-10 minutes (in contrast to the 15-20 minutes

she could stand in July 2010). [AR 44]  She also was limited in her ability to sit to only an hour,

depending on the comfort of the chair (in contrast to 2-3 hours of sitting in July 2010) and she

could only walk for 10-15 minutes before needing to sit (in contrast to an hour in July 2010).

[AR 44-46]

As to her foot pain, the ALJ determined that although she alleges ongoing bilateral foot

pain – which did not meet the 12 month durations requirement of a sever impairment –  there

was no evidence that she had returned to the podiatrist since the surgery for further treatment or

pain control, and no evidence that she has sought treatment from any other treating or consultive

source. [AR 13] The ALJ also noted that Plaintiff also indicated that her podiatrist did not

understand why she was in so much pain. [AR 17]  As to her fibromyalgia pain, the ALJ

correctly noted that she has few, if any, symptoms of the disease. [AR 19]  Although she

complains of pain all over her entire body, a May 5, 2010 neurological exam showed no

abnormalities other than diminished reflexes. [AR 19] An examination on June 8, 2010 showed

that her symptoms were most consistent with fibromyalgia, but the only abnormal finding was a

mild, fine, low amplitude tremor in her hand and report of headaches. [AR 19]  A September 27,

2010 exam was virtually unchanged, except for decreased vibratory sensation in the toes

bilaterally. [AR 20]  Likewise, her physical exam with her neurologist on November 2011 was

normal with an "absence of any objective signs or symptoms of the disease." [AR 20]  The ALJ

noted that there was no evidence that Plaintiff sought further treatment from her neurologist, or

that he gave her any temporary or permanent restrictions. [AR 20]

The ALJ found that these reasons – along with evidence related to her activities, physical

impairments, and mental functioning – undermined the Plaintiff's statements concerning her pain

and the intensity, persistence and limiting effects thereof.  As such, the ALJ's order contains

sufficient specific reasons, that are closely and affirmatively linked to substantial evidence, for

discounting of her credibility related to her limitations due to pain.  *See Kepler v. Chater, supra*,

68 F.3d at 391 (ruling that because credibility determinations are peculiarly in the province of

the finder of fact, they will not be disturbed when supported by substantial evidence).


ACCORDINGLY, for the foregoing reasons, I AFFIRM the Commissioner's final order.


Dated: October 1, 2015 in Denver, Colorado.


BY THE COURT:


    s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE